IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GLAZING CONCEPTS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | NO. CIV-05-0070-HE |
| ) | |
| HANOVER INSURANCE COMPANY, ) | |
| ET AL., ) | |
| ) | |
| Defendants. ) | |

## ORDER

Plaintiff Glazing Concepts, Inc. was insured under a businessowners policy issued by defendant Hanover Insurance Company ("Hanover"). After its business was damaged by a tornado on May 8, 2003, Glazing Concepts sought coverage under various policy provisions. Hanover hired several professionals to assist it in evaluating Glazing Concepts' loss, including defendant Buchanan, Clarke, Schlader, L.L.P. ("BCS"), an accounting firm. Several of the insured's claims were resolved quickly, but the parties' calculations of the insured's business interruption loss differed significantly. When Hanover responded to Glazing Concepts' proof of loss for business income and extra expenses, offering to settle the claim for significantly less than the insured had calculated it was worth, Glazing Concepts filed this lawsuit. The plaintiff asserts a breach of contract claim against Hanover, a negligence claim against BCS, and bad faith and conspiracy claims against both defendants. Hanover has filed a motion for partial summary judgment on the plaintiff's bad faith and

conspiracy claims and its requests for emotional distress and punitive damages.[1]

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence and any reasonable inferences that might be drawn from it are viewed in the light most favorable to the nonmoving party. Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.1998) (internal quotation and citation omitted), the court concludes the defendant's motion should be granted.

## BACKGROUND

A portion of Hanover's factual statement in its motion pertains to the resolution of Glazing Concepts' claims for coverage under other provisions of the businessowners policy. The plaintiff does not contest or, for the most part, even address these facts, asserting they are irrelevant to its bad faith claim. Hanover's handling of the other claims, however, provides some context for consideration of the plaintiff's bad faith claim. *See* Thompson v. Shelter Mut. Inc., 875 F.2d 1460, 1462 (10th Cir. 1989) ("'the jury may be shown the entire course of conduct between the parties to arrive at a determination of whether [the good faith]

---

[1] *BCS has filed a motion for summary judgment, which will be addressed in a separate order.*

standard had been breached or not.'") (quoting <u>Timmons v. Royal Globe Ins. Co.</u>, 653 P.2d 907, 917 (Okla. 1982). While their resolution will not be described in detail, the court notes that the plaintiff's other claims under the policy generally were resolved and paid promptly.[2] Within thirty days of its receipt of the proof of structural loss, Hanover settled the claim, paying Glazing Concepts $635,000. The plaintiff was advanced half of its $150,000 personal property claim a week after the loss and the other half was paid six days after receipt of the insured's proof of loss for its personal property. Another $50,000 was paid under the contractor's broadening endorsement within approximately sixty days of receipt of the proof of loss.

Glazing Concepts does not dispute the bulk of the remaining facts, as stated by Hanover, that pertain to its claim under the policy for lost business income and extra expenses ("business interruption loss").[3] A summary of those material facts follows.

The individuals involved in the handling of the plaintiff's claims were Jim Hennessey, an executive general adjustor with Hanover, Matthew Pearson, an accountant with BCS, and

---

[2]*Glazing Concepts makes one challenge to the promptness of Hanover's payment of its other claims. After admitting Hanover's factual statements nos.5-8, the plaintiff asserts that "Hanover did not make any payment to Plaintiff until Plaintiff got upset and basically told Mr. Hennessey (Hanover) to 'stick it' because Hennessey had made excuse after excuse for not paying anything." Plaintiff's response, p. 1, ¶ 3. Plaintiff's Attachment #1, Hugh Harrell depo., p. 145. (Harrell is the president of Glazing Concepts). Assuming this statement suffices to show that Hanover delayed paying the insured for its personal property loss, it does not demonstrate that Hanover was slow in providing coverage under other policy provisions. The court notes, though, that a $75,000 advance was paid under the business personal property coverage within a week of the tornado. Hanover's factual statement #8.*

[3]*The term "business interruption loss" will be used when referring to both lost business income and extra expenses.*

Ernie Brendle, a public adjuster retained by Glazing Concepts to manage its claims under the policy.

Beginning immediately after the May 2003, tornado and continuing through the fall, BCS repeatedly requested financial and operating information pertaining to the plaintiff's claim for business interruption loss. In late December, 2003, the insured finally provided financial operating statements for the period between January 2001 and August 2003.[4] Brendle than began sending BCS lists of the extra expenses Glazing Concepts had incurred[5] and, as information was received from the insured, BCS prepared reports analyzing Glazing Concepts' business interruption loss, which it submitted to Hennessey. He then provided some of the reports to Brendle and discussed the contents of others with him.

As Hartford determined, based on BCS's reports, that submitted expenditures were covered under the policy, it issued payments to the insured. Brendle also requested funds for Glazing Concepts to meet its expenses several times in early and mid-2004. In February, Hennessey agreed to advance the plaintiff $65,000 under the extra expense coverage and subsequent checks were issued in March and April for the insured's extra expenses in the amounts of $64,529 and $27,148. In early June, Hennessey sent Brendle a payment for

---

[4]*The insured's position is that many of BCS's requests for information were premature and unnecessarily burdensome as they pertained to its evaluation of the plaintiff's business income loss. That claim, the plaintiff asserts, could be not made until after the twelve month loss period expired. Glazing Concepts also maintains that some of the other documents BCS requested related to coverage claims that the insured and Hanover were settling without the assistance of BCS.*

[5]*At this time Brendle did not provide information pertaining to the plaintiff's loss of income. No formal proof of loss for either business income or extra expenses was filed until November, 2004.*

$100,027 for both extra expenses and lost income.

From the beginning (January 2004, on), the parties were not in agreement regarding the extent of the insured's extra expenses that were compensable under the policy. Brendle's computations generally exceeded BCS's determination by several hundred thousand dollars. Many items were placed on hold or in a "for discussion" category because BCS and Hanover concluded they lacked supporting documentation or could not determine, based on the information provided by the insured, whether they were attributable to the tornado.[6] See defendant's Exhibits 39, 44, 48, 50, 55, 61.

In late summer of 2004, Chancellor & Chancellor, Glazing Concepts' accounting firm, completed its analysis of the plaintiff's losses. On September 17, 2004, Brendle sent Hennessey a summary of the insured's business income and extra expense claim.[7] The plaintiff's calculated business interruption loss totaled $1,036,834 -- $272,140 for business income loss and $764,694 for extra expenses.[8] Brendle outlined the method he used to determine the insured's final claim and explained the problem he saw with BCS's approach

---

[6]*In a May 17, 2004, letter to Hennessey, Brendle referred to a prior conversation regarding coverage for labor, leases and other extra expenses that were "still up for discussion," and stated: There will be a substantial amount of our final claim that will involve coverage issue's that I am confident that I will be able to prove up and properly document to be able to reach an amicable resolution to this claim." Defendant's Exhibit 52.*

[7]*Brendle told Hennessey in May 2004, that he would be making a final claim in the near future. Defendant's Exhibit 53.*

[8]*As of May 25, 2004, BCS calculated the plaintiff's total business income and extra expense loss to be $247,590. Defendant's Exhibit 53. As of that date, the insured had claimed extra expenses amounting to $440,177, but had not provided a precise value for its loss of business income. Id.*

– it treated the insured as a manufacturing business, rather than as a non-manufacturing, service business. Glazing Concepts then submitted its Proof of Loss for business income and extra expense on November 15, 2004. When considering the claim, Hennessey noted BCS's remark in its October, 2004, report[9] that "Glazing Concepts had made significant changes to the Extra Expense claim by removing line items, adding line items and reclassifying line items into different categories," but had "provided no detailed listing of charges other than a general ledger from May 9, 2003 through May 8, 2004." Defendant's Exhibit 3, ¶42. He responded to the proof of loss on December 10, 2004, evaluating the business income loss as $161,240 and the extra expense loss as $96,972.11, for a total of $258,212.11. Hennessey concluded that some items were not covered and that the insured had not provided sufficient information with respect to the remaining disputed expenditures for him to determine if they were "extra expenses" within the policy coverage. *See* Defendant's Exhibit 3, ¶¶ 42-52

Hanover then issued a supplemental check in the amount of $1,508.11, which represented the difference between previous payments and Hennessey's loss evaluation. Hennessey explained Hanover's position regarding the insured's claim in a letter dated December 10, 2004, and suggested he meet with Brendle to discuss their different assessments. He stated in the letter that Hanover's rejection of the proof of loss was not a denial of "all or any part of any claim presented by Glazing Concepts, Inc. as it relates to the

---

[9]*BCS had updated its analysis in October, 2004, finding the insured's combined business income and extra expense loss amounted to $248,878. BCS placed extra expense charges totaling $635,992 in a "For discussion" column pending instruction from Hennessey as to whether the items were covered or additional supporting documentation was required.*

May 8, 2003 tornado damage to the property." Defendant's Exhibit 64. The plaintiff filed its complaint on January 20, 2005.

## DISCUSSION

The tort of bad faith was first recognized by the Oklahoma Supreme Court in Christian v. American Home Assurance Co., 577 P.2d 899 (Okla. 1978).[10] It arises from the insurer's implied duty to deal fairly and act in good faith with its insured. Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993). The duty is not breached if the insurer refuses to pay a claim or litigates a dispute with its insured if there is a legitimate dispute as to coverage or the amount of the claim, and the insurer's position is reasonable and legitimate. *Id.* Put otherwise, "[t]he insurer will not be liable for the tort of bad faith if it 'had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding payment under the policy.'" *Id.* (quoting McCoy v. Oklahoma Farm Bureau Mut. Ins. Co., 841 P.2d 568, 572 (Okla. 1992).

When presented with a motion for summary judgment on a bad faith claim, the court initially must decide, under the facts and as a matter of law, whether the insurer's conduct may be reasonably perceived as tortious. *Id.*

> Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed. To hold otherwise would subject insurance companies to the risk of

---

[10]*As this is a diversity action the substantive law of the State of Oklahoma applies.*

punitive damages whenever litigation arises from insurance claims. Id. at 1437 (internal citations and quotations omitted). Hartford's actions are evaluated in light of the facts it knew or should have known at the time it was asked to perform its contractual obligations. Id. The defendant contends the record reflects the existence of a legitimate dispute as to whether it owes the plaintiff any additional benefits under the policy. The court agrees.

The plaintiff essentially bases its bad faith claim against Hartford on the conduct of BCS. The crux of its argument is that BCS was manipulated and controlled by Hanover and essentially was not its advocate.[11] The insured believed that BCS was retained to help it and concludes, as BCS disagreed with the plaintiff's assessment of its loss, that the accounting firm was not independent and objective.

The plaintiff complains of BCS's failure to provide it with copies of its reports, but furnishes no basis, factual or legal, for such a duty.[12] As Hanover was the entity that hired BCS, evidence that the accounting firm reported to Hanover does not, alone, show that BCS lacked independence or was dominated by the insurer. Pearce's refusal to disclose anything to the plaintiff without the approval of his superior, Michael Clark, or Hennessey, also does

---

[11]*Harrell testified: "But it gave me a peace of mind that they [BCS] were working independently on our behalf to help us along in this claim." Plaintiff's Attachment #1, Harrell depo., p. 217.*

[12]*The plaintiff does not offer any evidence of discrepancies between the reports BCS provided the insurer and the reports or summaries of reports that the plaintiff was sent. Its criticism of the reports stems, in part, from BCS's alleged mischaracterization in the reports of information the plaintiff had provided the accounting firm. See infra note 14.*

not demonstrate bad faith. Office procedure dictated that his reports were initially reviewed by a partner and then forwarded to the adjuster, who determined if the information could be provided to the insured. His comment in a file memo: "Once again, I didn't comment on our updated loss computation," merely indicates compliance with office policy. Plaintiff's Attachment #1, Pearson depo., p. 39-40.

As for its contention that BCS's analyses were "grossly in error" due to its misunderstanding of Glazing Concepts' business operation, the plaintiff fails to show more than a disagreement regarding the amount of its business interruption loss. Throughout its brief and exhibits the plaintiff reiterates that BCS could not properly evaluate its claim because Pearson did not go to the company site. His failure to visit precluded him, the plaintiff asserts, from "fully understand[ing] the fundamental inner workings of this type of business ... [and] ... caused many errors to occur in BCS' evaluations...." Plaintiff's Attachment #2, Brendle affidavit, ¶ 3.[13] While these errors may exist, the plaintiff does not sufficiently identify them.[14] The plaintiff also has failed to submit any evidence that explains

---

[13]*Brendle's affidavit consists almost entirely of conclusory statements that are insufficient to controvert Hanover's evidence.*

[14]*The plaintiff also does not explain or offer any evidence supporting what it refers to as one of its primary complaints against BCS – the accounting firm's issuance of reports to Hanover "in a format that appeared the insured had voluntarily submitted documentation and was making a claim in this format." Plaintiff's Attachment #2, Brendle affidavit, ¶¶ 13, 11. Brendle's statement that this resulted in numerous mistakes and misinformation being presented to Hanover does not create a factual question as to Hanover's bad faith.*

why BCS/Hartford's analysis of its business interruption loss claim was unreasonable.[15] *See* Defendant's Exhibit 3, ¶¶ 42-52 (Hennessey's explanation for nonpayment of the plaintiff's claimed extra expenses). The plaintiff did not submit the analysis of the accounting firm which apparently assisted with or prepared its final claim for lost income and extra expenses. It did not present testimony from an accountant demonstrating that BCS's reports were baseless or unreasonable.[16] Finally, as noted by the defendant, the plaintiff also did not attach an affidavit regarding proper insurance claims handling from the expert it has designated to testify at trial on that issue.

Instead, the plaintiff attempts to bolster its bad faith claim with general, unsubstantiated statements. Such comments include: "Hanover made promises and then delayed payment,[17] accidently mailed the checks to the wrong address, accidentally put an

---

[15] *When asked to explain how the schedules prepared by BCS were "grossly in error," as alleged by the plaintiff, Harrell responded: "By the way they tried to make the accounting, such as outsourcing. There was no way they analyzed our business, from the way our business operates. We put a request out to them to come and review our business, see how it operates and be there, because it was not accurate." Plaintiff's Attachment #1, Harrell depo., p. 209. This general statement is insufficient to create a triable issue of fact as to the reasonableness of Hanover's conduct.*

[16] *To the extent the plaintiff's claim is premised on delayed payment by Hanover, Glazing Concepts has not produced evidence of unreasonable delay. Harrell even admits that, because of the circumstances, Glazing Concepts' production of information BCS needed to evaluate its claims was delayed. Plaintiff's Attachment #1, Harrell depo., p. 217-19.*

[17] *The plaintiff refers to an offer of $65,000 that was not paid. However, that was an offer of compromise. See defendant's statement of fact #42.*

extra name or two on the checks so it would have to be re-issued, etc., etc.;"[18] "Hanover attempted to cover its tactics by issuing lots of correspondence and having BCS do the same, but the truth is that Hanover was not dealing in good faith with the plaintiff;" or "Hanover's practice was that it would take a certain position that would benefit it, but that was contrary to the insured's interest, and then make the insured prove otherwise, and Hanover followed this bad faith practice in this case."[19] Plaintiff's response, pp. 2-3. These conclusory statements, both in the plaintiff's brief and Brendle's affidavit,[20] do not demonstrate the existence of a factual dispute as to Hanover's handling of the plaintiff's business interruption claim. *See generally* Oulds, 6 F.3d at 1442 ("In McCoy and Capstick, cases in which the question of bad faith was required to be submitted to the jury, the evidence of the insurer's defense to the underlying claim was so weak that a reasonable inference could be drawn that the insurer denied the claim in bad faith.").

"Given the facts known to [Hanover] at the time a decision on payment was required, there was a legitimate dispute concerning coverage, which the insurance company had a right to have settled in a judicial forum." *Id.* at 1440. *See* Manis v. Hartford Fire Ins. Co., 681

---

[18]*Hanover did reissue one check at the insured's request, but the submitted evidence does not indicate that "extra names" were placed on the original check by accident or even erroneously. See defendant's fact statement nos. 22 -24; defendant's exhibit 14.*

[19]*The evidence cited to support this last statement, a page from Hennessey's deposition, fails to substantiate or even relate to it. Plaintiff's Attachment #1, Hennessey depo., p. 144.*

[20]*For example, Brendle attests that "Mr. Hennessey selected BCS because they are a Forensic Accounting firm that represents 'primarily' insurance companies. An undisclosed duty of this type of firm is to evaluate the accounting from an insured for possible fraudulent claims by the insured." Plaintiff's Attachment #2, Brendle affidavit, ¶ 3.*

P.2d 760 (Okla. 1984). *See* Defendant's Exhibits 3, 28-29, 44, 48, 55, 64. Because a legitimate dispute existed as to coverage, Hartford did not breach the duty of good faith merely by refusing to pay the entire amount of the plaintiff's claim for business interruption loss. That, coupled with the plaintiff's failure "to produce specific evidence of bad faith," Oulds, 6 F.3d at 1442, entitles the defendant to summary judgment on the plaintiff's tort claim, *id.*, and its punitive damages request, which is based on the tort claim. The plaintiff failed to address the defendant's motion insofar as it sought judgment on the plaintiff's conspiracy claim and its request for damages for emotional distress. Those claims are confessed. LCvR. 7.2(e). The court finds they also are not supported by the essentially undisputed facts.

Accordingly, Hanover's motion for partial summary judgment is **GRANTED**. Judgment on the plaintiff's bad faith and conspiracy claims, and its requests for emotional distress and punitive damages will be entered when the action is concluded with respect to all claims and parties. Fed.R.Civ.P. 54(b).

IT IS SO ORDERED this 15th day of February, 2006.

JOE HEATON
UNITED STATES DISTRICT JUDGE