**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| GLAZING CONCEPTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. CIV-05-0070-HE |
| | ) | |
| HANOVER INSURANCE COMPANY, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff Glazing Concepts, Inc. was insured under a businessowners policy issued by defendant Hanover Insurance Company ("Hanover"). After its business was damaged by a tornado on May 8, 2003, Glazing Concepts sought coverage under various policy provisions. Hanover hired several professionals to assist it in evaluating Glazing Concepts' loss, including defendant Buchanan, Clarke, Schlader, L.L.P. ("BCS"), an accounting firm. Several of the insured's claims were resolved quickly, but the parties' calculations of the insured's business interruption loss differed significantly. When Hanover responded to Glazing Concepts' proof of loss for business income and extra expenses, offering to settle the claim for significantly less than the insured had calculated it was worth, Glazing Concepts filed this lawsuit. The plaintiff alleged in its complaint a breach of contract claim against Hanover, a negligence claim against BCS, and bad faith and conspiracy claims against both defendants. BCS has filed a motion for summary judgment.[1] In its response,

---

[1]*Hanover filed a motion for partial summary judgment, which has been addressed in a separate order.*

the plaintiff states that the conspiracy and aiding and abetting allegations in the complaint are not separate claims, but part of its bad faith claims against the defendants. Nonetheless, as the complaint is ambiguous as to whether a conspiracy claim is asserted, summary judgment on it will be granted in defendant BCS's favor.[2]

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence and any reasonable inferences that might be drawn from it are viewed in the light most favorable to the nonmoving party. Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.1998) (internal quotation and citation omitted), the court concludes the defendant's motion should be granted.

### BACKGROUND

The principal individuals involved in the handling of the plaintiff's claims under the policy were Jim Hennessey, an executive general adjustor with Hanover, Matthew Pearson, an accountant with BCS, and Ernie Brendle, a public adjuster retained by Glazing Concepts

---

[2]*The court notes that the heading on page 7 of plaintiff's response states: "Plaintiff's claims against BCS for bad faith, conspiracy, aiding and abetting, and third party beneficiary are not subject to summary adjudication."*

to manage its claims. Hanover hired BCS to review and analyze the plaintiff's financial information and records in conjunction with various types of coverage provided by the policy.[3] However, only that encompassed by the business income and extra expense provision ("business interruption loss")[4] is at issue here. The facts that pertain to the plaintiff's claim for business interruption loss are essentially undisputed.

Beginning immediately after the May 2003, tornado and continuing through the fall, BCS repeatedly requested financial and operating information from the insured.[5] In late December, 2003, Glazing Concepts finally provided monthly financial and operating statements for the period between January 2001 and August 2003. Brendle first contacted Pearson on January 15, 2004. He explained that he had been granted a specific power of attorney by Glazing Concepts, authorizing Pearson to discuss the plaintiff's business interruption claim directly with him. Brendle stated that he would address any questions Pearson might have regarding extra expenses.

In mid-January, 2004, BCS sent Hennessey a preliminary report analyzing Glazing Concepts' business interruption loss, and continued requesting additional documents from

---

[3]*The plaintiff admits that the accounting firm was not retained to prepare its insurance claims.*

[4]*The term "business interruption loss" will be used when referring to both lost business income and extra expenses.*

[5]*The insured's position is that many of BCS's requests for information were premature and unnecessarily burdensome as they pertained to its evaluation of the plaintiff's business income loss. That claim, the plaintiff asserts, could be not made until after the twelve month loss period expired. Glazing Concepts also maintains that some of the other documents BCS requested related to coverage claims that the insured and Hanover were settling without the assistance of BCS.*

Brendle.  As Brendle sent BCS information pertaining to extra expenses Glazing Concepts had incurred,[6] BCS periodically prepared reports analyzing the insured's business interruption loss, which it submitted to Hennessey.  He then provided some of the reports to Brendle and discussed the contents of others with him.  As Hartford determined, based on BCS's reports, that submitted expenditures were covered under the policy, it issued payments to the insured.[7]  *E.g.,* defendant's Exhibit 21.

The parties disagreed regarding the extent of the insured's extra expenses that were compensable under the policy essentially from the beginning of 2004.  *See* Defendant's Exhibit 21 (Hennessey March 23, 2004, letter to Brendle stating that BCS, in its March 8, 2004 report, calculated the insured's extra expense loss as totaling $139,681, while reporting that Glazing Concepts had submitted a claim for extra expenses in the amount of $259,874).  Many extra expense items were placed in a "for discussion" category because BCS and Hanover concluded they lacked supporting documentation or could not determine, based on the information provided by the insured, whether they were attributable to the tornado.  *See id.*

On September 16, 2004, Brendle sent BSC an outline of the insured's business income and extra expense claim.  The business interruption loss as calculated by the plaintiff totaled $1,036,834 -- $272,140 for business income loss and $764,694 for extra expenses.  As

---

[6]*At this time Brendle did not provide information pertaining to the plaintiff's loss of income. No formal proof of loss for either business income or extra expenses was filed until November, 2004.*

[7]*While Hennessey relied on BCS's reports, he made the coverage determinations, sometimes disagreeing with BCS's analysis. E.g., defendant's Exhibit 21.*

computed by BCS in its December 10, 2004, preliminary analysis, the insured's combined business income and extra expense loss amounted to $251,722. BCS placed extra expense charges totaling $548,487 in a "For discussion" column.

Hennessey responded to the plaintiff's proof of loss on December 10, 2004,[8] evaluating the business income loss as $161,240 and the extra expense loss as $96,972.11, for a total of $258,212.11. He concluded that some items were not covered and that the insured had not provided sufficient information with respect to the remaining disputed expenditures for him to determine if they were "extra expenses" within the policy coverage. *See* Defendant Hanover's Exhibit 3, ¶¶ 42-52.

Hanover then issued a supplemental check in the amount of $1,508.11, which represented the difference between previous payments and Hennessey's loss evaluation. Hennessey explained Hanover's position regarding the insured's claim in a letter dated December 10, 2004, and suggested he meet with Brendle to discuss their different assessments. Defendant Hanover's Exhibit 64. The plaintiff filed its complaint on January 20, 2005.

## DISCUSSION

The plaintiff claims it was a third party beneficiary of the contract between Hanover

---

[8]*Glazing Concepts submitted its Proof of Loss for business income and extra expense on November 15, 2004. This and the remaining facts are taken from defendant Hanover's motion for partial summary judgment. Doc. #76. They were not disputed by the plaintiff.*

and BCS and bases both its bad faith and negligence claims on its asserted beneficiary status. Both claims fail. The plaintiff's bad faith claim lacks a legal basis and its negligence claim lacks factual support.

Bad faith

The tort of bad faith was first recognized by the Oklahoma Supreme Court in Christian v. American Home Assurance Co., 577 P.2d 899 (Okla. 1978).[9] It arises from the insurer's implied duty to deal fairly and act in good faith with its insured. Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993). The duty does not extend to "a stranger to the contract." Timmons v. Royal Globe Ins. Co., 653 P.2d 907, 913 (Okla. 1982). *Accord* Hoar v. Aetna Cas. and Sur. Co., 968 P.2d 1219, 1223-24 (Okla. 1998).[10] As Glazing Concepts was not a party to the agreement between BCS and Hanover, it may not assert a bad faith claim against BCS.

Negligence

To establish liability for negligence, the plaintiff must prove that (1) BCS owed the plaintiff a duty of care, (2) BCS breached that duty, and (3) that the breach was a direct cause of the plaintiff's injuries and resulting damage. Stroud v. Arthur Andersen & Co., 37 P.3d

---

[9]*As this is a diversity action the substantive law of the State of Oklahoma applies.*

[10]*In* Hoar, *the Oklahoma Supreme Court quoted from its opinion in* McWhirter v. Fire Ins. Exchange Inc,, *878 P.2d 1056. 1058 (Okla.1994): "'In* Allstate Ins. Co. v. Amick ... *[w]e said that [a bad faith] action by an insured against its insurer is allowed because of the implied duty of good faith and fair dealing recognized in that relationship. The duty arises from the contractual relationship between the insurer and the insured. Third parties are strangers to the contract. Absent a contractual or statutory relationship, there is no duty.'"* Hoar, *968 P.2d at 1223-24.*

6

783, 788 (Okla. 2001); Hesser v. Central Nat'l Bank & Trust Co., 956 P.2d 864, 867 (Okla, 1998). The Oklahoma courts have "recognize[d] that a duty may be created by a contract which is made expressly for the benefit of a third-party non-client beneficiary when harm to the beneficiary is foreseeable."[11] Hesser, 956 at 864 (will-drafting attorney owed duty to heir, as third-party beneficiary of attorney-client agreement, to have will executed properly). However, the courts also have imposed a duty based on general negligence principles in the absence of contractual privity and without a discussion of third-party beneficiary status. *E.g.*, Stroud, 37 P.3d at 793-94 (applying common law principle embraced in Restatement (Second) of Torts § 552, court held auditor owed duty of care to foreseeable user of audit data); Bradford Sec. Processing Servs., Inc. v. Plaza Bank and Trust, 653 P.3d 188 (Okla. 1982) (counsel, who knew his legal opinion regarding bonds would be relied upon by bond purchasers, owed duty to pledgee who foreclosed on bonds and could be sued by pledgee for negligence).

Such a duty was found to exist by the Oklahoma Court of Civil Appeals in a recent case with facts approximating those present here. In Brown v. State Farm Fire and Cas. Co., 58 P.2d 217 (Okla.Civ.App. 2002), the Oklahoma appellate court held that an independent investigator hired by an insurance company to investigate the cause of a fire could be sued by the insured for negligent investigation.[12] This court has considerable doubt whether the

---

[11]*Oklahoma law provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." 15 Okla. Stat. § 29.*

[12]*The appellate court acknowledge in* Brown *that, while the state courts were divided on the issue, the majority held that an independent investigator hired by an insurer owed no duty of care*

7

Oklahoma Supreme Court would ultimately conclude that a duty of care exists in the circumstances present here or in Brown. It is one thing to impose liability on a person who, by reason of the nature of their professional undertaking, renders services designed to be relied upon by third parties (such as an auditor or bond counsel). It is something else again to impose liability on every professional hired by a party — here, an insurer — to assist it. However, it is unnecessary for this court to determine whether to follow Brown,[13] because, even assuming BCS owed a duty to the insured, the plaintiff has failed to proffer evidence of a breach of that duty sufficient to create a material question of fact warranting submission of the plaintiff's negligence claim to a jury.

In support of its negligence claim, the plaintiff asserts the accounting firm miscalculated its business interruption loss and caused the processing and payment of its claim to be delayed.[14] As proof of its malpractice, the plaintiff points to BCS's failure to provide it with copies of its reports, but cites no basis, factual or legal, for such an

---

*to the insured with regard to its handling of the investigation.  Brown, 58 P.2d at 219.*

[13]*Brown has persuasive effect, but is not accorded precedential value under Oklahoma law. Okla.Stat. tit. 12, ch. 15, app., Okla.S.Ct. Rule 1.200(c)(2). While not binding, a decision by the state's intermediate appellate court does provide some evidence of how Oklahoma's highest court might rule on the issue, and can be considered as such.*

[14]*While admitting that BCS was not hired to prepare its claim, the plaintiff states that it "was led to believe that BCS was conducting the analysis on Plaintiff's behalf." Plaintiff's response, p. 13. See Plaintiff's Attachment #1, Harrell depo., p. 217 ("But it gave me a peace of mind that they [BCS] were working independently on our behalf to help us along in this claim."). The plaintiff does not explain, though, how it was so misled, or offer any evidence of actions taken by either BCS or Hennessey that caused its misconception. Indeed, given that the plaintiff hired its own accounting firm to assist it in preparing its claim, the suggestion that BCS was working for the plaintiff is plainly implausible.*

obligation.[15] Because Hanover hired BCS, evidence that the accounting firm reported to Hanover does not, alone, show that BCS lacked independence, was dominated by the insurer, or otherwise failed to perform the professional duty owed.  Pearce's refusal to disclose anything to the plaintiff without the approval of his superior, Michael Clark, or Hennessey, also does not demonstrate bad faith.  Office procedure dictated that his reports were initially reviewed by a partner and then forwarded to the adjuster, who determined if the information could be provided to the insured.  His comment in a file memo: "Once again, I didn't comment on our updated loss computation," merely indicates compliance with office policy. Plaintiff's Attachment #1, Pearson depo., pp. 39-40.

As for its contention that BCS's analyses were "grossly in error" due to its misunderstanding of Glazing Concepts' business operation, the plaintiff fails to show more than a disagreement regarding the amount of its business interruption loss.  Throughout its brief and exhibits the plaintiff reiterates that BCS could not properly evaluate its claim because Pearson did not go to the company site.  The defendant's failure to visit precluded it, the plaintiff asserts, from "fully understand[ing] the fundamental inner workings of this type of business ... [and] ... caused many errors to occur in BCS' evaluations and caused

---

[15]*The plaintiff does not offer any evidence of discrepancies between the reports BCS provided the insurer and the reports or summaries of reports that the plaintiff was sent.  The plaintiff also does not explain or offer any evidence supporting what it refers to as one of its primary complaints against BCS – the accounting firm's issuance of reports to Hanover "in a format that appeared the insured had voluntarily submitted documentation and was making a claim in this format." Plaintiff's Attachment #2, Brendle affidavit, ¶¶ 13, 11.  Brendle's statement that this resulted in numerous mistakes and misinformation being presented to Hanover does not create a factual question as to whether BCS failed to exercise reasonable care or competence in its analysis of the plaintiff's business interruption loss.*

undue time delays in handling the claim." Plaintiff's Attachment #2, Brendle affidavit, ¶ 3.[16] While these errors may exist, the plaintiff does not sufficiently identify them and it is certainly not obvious how physical presence on a particular premises is essential to an understanding of the financial circumstances of the business. The plaintiff also has failed to submit any evidence supporting its assertion that BCS's evaluation of its business interruption loss was flawed.[17] *See generally* defendant's Exhibit 16, 19, 22. The plaintiff did not provide the analysis of the accounting firm which apparently assisted with, or prepared, its final claim for lost income and extra expenses. See Plaintiff's Attachment #1, Harrell depo., p. 217; defendant's Exhibit 29 (invoice from Chancellor & Chancellor, Inc.). It also did not present testimony from an accountant demonstrating that BCS's reports were erroneous.[18]

Instead, the plaintiff makes general, unsubstantiated statements, such as: "There is ample evidence in this case from which a jury could conclude that BCS was anything but fair and impartial and, in fact was doing its best to skew the figures in Hanover's favor, was

---

[16]*Brendle's affidavit consists almost entirely of conclusory statements that are insufficient to controvert BCS's evidence.*

[17]*When asked to explain how the schedules prepared by BCS were "grossly in error," as alleged by the plaintiff, Harrell responded: "By the way they tried to make the accounting, such as outsourcing. There was no way they analyzed our business, from the way our business operates. We put a request out to them to come and review our business, see how it operates and be there, because it was not accurate." Plaintiff's Attachment #1, Harrell depo., p. 209. This general statement is insufficient to create a triable issue of fact as to BCS's alleged breach of duty.*

[18]*To the extent the plaintiff's claim is premised on delayed payment, Glazing Concepts has not produced evidence of unreasonable delay. Harrell even admits that, because of the circumstances, Glazing Concepts' production of information BCS needed to evaluate its claims was delayed. Plaintiff's Attachment #1, Harrell depo., pp. 217-19.*

absolutely taking direction from Hanover, and was working against the Plaintiff at every step." Plaintiff's response, p. 5. These conclusory statements, both in the plaintiff's brief and Brendle's affidavit, do not demonstrate the existence of a factual dispute as to whether BCS was negligent in analyzing the plaintiff's business interruption claim or preparing its reports for Hanover. In the circumstances existing here, particularly including the nature of the determination BCS and others were attempting to make, something more than a mere disagreement over the numbers must be shown. The court concludes no such showing has been made. The plaintiff simply has not produced evidence demonstrating a breach by BCS of any duty it may have owed the insured.

BCS is entitled to summary judgment on the plaintiff's bad faith and negligence claims, and its punitive damages request, which is based on these claims. As discussed previously, the defendant is also entitled to summary judgment on the plaintiff's conspiracy claim. Accordingly, BCS's motion for summary judgment is **GRANTED**. Judgment on the plaintiff's claims against it will be entered when the action is concluded with respect to all claims and parties. Fed.R.Civ.P. 54(b).

**IT IS SO ORDERED**.

Dated this 17th day of February, 2006.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE